IN RE ESTATE OF MATTEUS PANKO.

MINNIE HARMS ET AL., APPELLANTS, V. ESTATE OF MATTEUS PANKO ET AL., APPELLEES.

FILED JANUARY 9, 1909.   No. 15,431.

1. Specific performance of a contract between the sole legatee and devisee in a will, who was an aged woman, and her children, the heirs of her deceased husband, by the terms of which the larger portion of the property left to the widow is to be surrendered by her and distributed among the children, upon the consideration that certain objections to the probate of the will filed by some of the heirs will be dismissed, will not be enforced, unless the proof that such a contract was entered into is clear and satisfactory.

2. Specific Performance. In such a case, the transaction will be closely scrutinized and the contract must be clearly proved. No presumptions will be indulged in its favor.

APPEAL from the district court for Otoe county: PAUL JESSEN, JUDGE. Affirmed.

E. R. Hitchcock, George A. Adams and S. P. Davidson, for appellants.

Hugh La Master and D. W. Livingston, contra.

LETTON, J.

Matteus Panko, who was a resident of Otoe county, died leaving a last will, by which he gave to his wife, Maria Panko, absolutely, all of his property, both real and per-

13

sonal. The will recites that he gave it to her "because of the love and devotion I have for my said wife and my confidence in her that she will divide the balance of said property that may remain at her death share and share alike among our lawful children." His wife was named as executrix. The will was offered for probate, when objections were filed by Anna Lipps, Christina Straube, Minnie Harms and Paulina Harms, daughters of the deceased, alleging mental incapacity of the testator and undue influence on the part of their brothers. These objections were afterwards withdrawn, and the will admitted to probate. The executrix qualified, paid the debts and expenses, and made a final report asking for an order "that all the property be delivered to Maria Panko, the sole devisee and legatee under the will." An application was made for a different distribution of the estate by certain of the children of the decedent, alleging, in substance, that after the objections to the probating of the will had been filed by them, Maria Panko, their mother, the sole beneficiary under the will, and the others heirs of the deceased, Herman Panko, Matteus Panko and Godfrey Panko, agreed verbally with them upon a division of the assets of the estate, by which the widow was to have the sum of $7,000 in money or notes to be selected by her; that their sister, Anna Lipps, was to have $4,000 in money or notes to be selected by her, and the remainder of the estate was to be divided between all the other children and heirs equally, except that two grandchildren were to have the share of their mother; that the agreement was made between all the children and the widow in good faith and in order to prevent litigation, and that, relying on the agreement, the petitioners dismissed and withdrew the objections filed to the will; and praying that the property be distributed according to the alleged oral agreement. The allegations were denied by answer. A hearing was had in the county court, which found for the petitioners and ordered distribution accordingly. An appeal was taken to the district court, which found for the lega-

tee, Maria Panko, and rendered judgment dismissing the application. An appeal has been taken to this court from this judgment.

We have heretofore held that a mutual promise made between heirs to an estate, whereby the objections filed or made to the probate of a will are dismissed in consideration of an agreement by all of the parties concerned in the estate that the property is to be divided among them upon terms other than those provided in the will, will, if made in good faith, be enforced by a decree of court. *Grochowski v. Grochowski*, 77 Neb. 506, 510. In that case the agreement which it was sought to enforce was evidenced by a writing, and the defense was that such a contract was invalid, as being against public policy, and without consideration. The fact of the contract having been entered into was not questioned. In this case it is conceded that the law of the *Grochowski* case applies, and it is urged that the evidence is convincing that the contract was entered into, and that the findings and judgment are against the evidence. Before examining the evidence in detail, we deem it advisable to say that as a general rule the court will not enforce the specific performance of a contract of this nature, unless the proof is clear and satisfactory that the alleged contract was actually entered into. More especially is this the case where the contract which is the subject of inquiry has been entered into between an aged mother upon the one hand and her children or some of them upon the other, and where the result of the contract would be to deprive the aged parent of property or rights therein for the benefit of the children. In such a case the transaction will be closely scrutinized and must be clearly proved. No presumptions will be indulged in its favor.

The will was filed for probate on February 6, 1906, and on February 28 the objections were filed. Shortly after this Henry Harms, husband of one of the contestants, and Godfrey Panko met and a settlement was suggested. Another meeting was held at which Harm Harms, another

son-in-law, was also present. This meeting was at the home of the Rev. William Beckman, who was the pastor of the church to which the father, mother and some of the children belonged. He was a friend of all of the parties, and had been appointed special administrator of the estate pending the hearing upon the objections to admitting the will to probate. It seems that three meetings took place, at which the two Harms, Godfrey Panko and Mr. Beckman were present. On the 10th of March, 1906, at Mr. Beckman's house in Burr, he suggested that the matter might be settled by giving to Mrs. Lipps $4,000, the other property to be divided equally among the remaining heirs, the grandchildren to receive the share that their mother would have had, if alive; that each heir should pay to the mother $50 that year and on the 1st day of January, 1907, and every succeeding 1st day of January each heir should pay $100 to the mother. This was put in writing and agreed upon between the parties present. It was then arranged to meet at the house of Mrs. Panko to submit the proposition to her. On the morning of March 13 the parties met there, as agreed. Mr. Beckman produced the writing with this proposition, but the widow rejected it, and said she wanted the will to stand, but said further that, if she agreed to a settlement, she wanted a portion of the property at once. Beckman then proposed that she should receive $7,000 or its equivalent in notes to be selected by her; that Mrs. Lipps should receive $4,000 in like manner, and that the rest should be equally divided among the remaining heirs. Up to this point there is substantially no conflict in the testimony. Mr. Beckman testifies that he then requested every one of the persons interested who were present to state whether they were willing to enter into the agreement, and that the widow, Matteus Panko and Godfrey Panko, Straube and the two Harms all assented; that Matteus Panko was present when the agreement was consummated, and he thinks that Matteus was the first person who left. Beckman further testifies that the evening before they went to Mrs. Panko's

house a paper was drawn up and signed by Mrs. Lipps, in which she agreed that, if she received $4,000, she would make no further claim upon the property of her mother, and the payment of this sum was guaranteed to her in writing by the two Harms brothers; that this paper was read and explained to the mother at the time, and handed to Matteus Panko, who said he would take it to Sterling and have it properly executed by the notary. Mr. Beckman said he told the widow it might take years to settle the matter if it was in litigation. On cross-examination it developed that at the time this proposition was made the two daughters, Mrs. Lipps and Mrs. Eilers, knew nothing about it, nor did the two grandchildren. This was the first time that the matter of settlement had been spoken of to the widow by any of the parties so far as the testimony shows. Henry Harms testified substantially as did Mr. Beckman, and so also did Harm Harms and Herman Straube, who were both present at the time. Mr. Boatsman, a notary of Sterling, testified that Matteus Panko brought him the paper, signed by Mrs. Lipps, on the afternoon of March 13, and said that he wanted it stamped; that he called up Mrs. Lipps over the telephone, and, after speaking to her, put his jurat upon it and handed it back to Panko. Fred Moss, one of the witnesses to the will, says that he had some conversation with Matteus Panko and Godfrey Panko about the probating of the will soon after this, and that they told him that a settlement had been made. Charles Lipps, husband of Anna Lipps, also testified that Godfrey told him they had settled, and that some time afterwards the widow said to him that she was willing to make settlement, but that Matteus objected. Mrs. Lipps testified that she had a conversation with her mother after the alleged settlement, and asked her mother if she was going to pay her; that her mother said she could not because the law would not allow her to pay it.

For the defense Mrs. Panko denies that the agreement was made when all the parties were together. It appears that she does not understand English at all, nor German

very well, speaking only Wendish. She says that Matteus was not there at the time the talk was had with Mr. Beckman, but that he came in afterwards. Mrs. Eilers testifies she was not present, and that she never agreed to the settlement. Matteus Panko testifies that when he arrived all of the others were in the house, and that Mr. Beckman told him they had settled; that he was not asked to agree, and did not agree; that he was called to go then by telephone from a neighbor; that he did not inquire as to the terms of the settlement, and said nothing about it; that he was asked to take a paper to Mr. Boatsman at Sterling, and did so. He admits that he went to Nebraska City the next day to have the will probated, and that he owes his mother a large sum of money. His account of his actions at the meeting is vague and unsatisfactory, and in other respects it seems doubtful, but his brother, Herman Panko, corroborates him in saying that he came after the settlement was made. As to himself, Herman testifies that he agreed to the proposal made by Mr. Beckman the day before, but that, after he went to his mother's house and the arrangement was changed, he was not asked whether he agreed to the new proposal, and did not agree to it, but that afterwards he said that the settlement was made and he would stand to it if the others would. It will be seen from this resume of the evidence that, while Beckman, Harms and Straube agree as to what took place at the home of Mrs. Panko, they are contradicted as to the fact of Matteus Panko being present at the time of the proposed agreement being assented to by Herman Panko, Mrs. Panko and Matteus Panko. It is true that there are several circumstances, such as the immediate withdrawal of the objections to the probate of the will and the statements made afterwards by the sons, which tend to support the testimony of the plaintiffs as to what took place that morning, but there is a direct conflict in the testimony, and it is not clear to our minds that Mrs. Panko clearly understood the whole transaction and what her rights were in the premises. It also appears

that neither Mrs. Eilers nor the two grandchildren were present at the transaction, either in person or by representation and it does appear that they had no voice in it. The witnesses were all before the judge of the district court, who had opportunities of observing their demeanor and judging of the truth or falsity of their testimony which we do not have. His finding and judgment upon the matter are entitled to our consideration and in such a case as this we do not feel justified in substituting our judgment for his upon the facts, even if it were proper for us to do so.

Upon the whole case the evidence is not so clear, satisfactory and convincing that it would justify us in virtually setting aside the will of the deceased and depriving the aged widow of about $20,000 worth of property by reversing the judgment of the district court and compelling the performance of a contract such as the one sought to be established in this case.

The judgment of the district court is

AFFIRMED.

DEAN, J., not sitting.